IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

SARA M. LAMBERT SMITH
and SCOTT SMITH,

                Plaintiffs,

v.                                            CIVIL ACTION NO.   5:14-cv-30075

UNITED STATES OF AMERICA,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

On the 18th day of July, 2016, came the Plaintiffs, Sara M. Lambert Smith and Scott Smith, in person and by counsel, Arden J. Curry, II, Robert Berthold, Jr., and Holly DiCocco, and also came the United States by its Assistant United States Attorneys, Fred B. Westfall, Jr., and Matthew C. Lindsay, for a bench trial in the above-styled matter.   The trial concluded on July 19, 2016.   In addition to the evidence and testimony presented during the course of the trial, the Court has reviewed the *Defendant United States of America's Proposed Findings of Fact and Conclusions of Law* (Document 83), the *Plaintiffs' Proposed Findings of Fact and Conclusions of Law* (Document 84), submitted prior to trial, and the *Defendant United States of America's Supplemental Proposed Findings of Fact and Conclusions of Law* (Document 98), and the *Plaintiffs' Amended Proposed Findings of Fact and Conclusions of Law* (Document 99), submitted after the conclusion of trial.   In addition, the Court has reviewed the videotaped testimony of Dr.

1

David Talan, submitted by the Plaintiffs and subject to objection by the Defendant, as well as that of Dr. David Seidler.

For the reasons stated herein, the Court finds that the Plaintiffs have demonstrated by a preponderance of the evidence that Ms. Smith's injuries were the result of the negligence of Dr. Roy Wolfe, who is deemed an employee of the United States.

## FINDINGS OF FACT

The Plaintiffs, Sara Lambert Smith and her husband, Scott Smith, initiated this action with a *Complaint* (Document 1) filed on December 16, 2014. Ms. Smith alleges medical malpractice under the Federal Tort Claims Act (FTCA) in relation to a hysterectomy performed by Dr. Wolfe, and Mr. Smith seeks damages for loss of consortium. The Smiths filed an administrative claim for damages, which the United States Department of Health and Human Services denied on October 21, 2014.

Ms. Smith began going to Access Health Associates in May 2013 as a prenatal patient. On December 18, 2013, at 38 weeks' pregnancy, she gave birth to her first child by cesarean section. She was 24 years old at the time. The doctor who performed the cesarean section noted that her placenta was abnormally adherent. He removed the placenta manually and scraped the uterine lining with a curette to ensure the placenta was fully removed. He did not note any other abnormality or problem, and Ms. Smith was discharged on December 20, 2013. She had no post-natal problems until experiencing mild spotting on December 24th. Around 2:30 a.m., on December 25, 2013, she passed a large blood clot and began to experience heavy vaginal bleeding. Mr. and Ms. Smith called for an ambulance, but it did not arrive after an hour or so, and Mr. Smith

drove Ms. Smith to the emergency room at Raleigh General Hospital. Before arriving at the hospital, Ms. Smith experienced two episodes of syncope, or brief fainting.

Ms. Smith was admitted to the emergency room a little after 5:00 a.m., and the E.R. physician contacted Dr. Wolfe around 5:15 a.m., with a description of her continuing heavy bleeding, pallor, and syncope episodes. Blood tests revealed an elevated white blood cell count, and an ultrasound showed possible retained products of conception. Her test results were otherwise normal, and indicative of hemodynamic stability[1] despite her ongoing bleeding. Ms. Smith's vital signs were tracked throughout her time in the emergency room, and remained normal. Dr. Wolfe, who was the on-call Ob/Gyn, saw Ms. Smith around 6:30 a.m., and scheduled her for a dilation and curettage (D&C) and possible hysterectomy. Though Ms. Smith does not recall the conversation, Dr. Wolfe informed her of the risks of the surgery and the possibility that a hysterectomy would be necessary to stop the bleeding, and she indicated her desire to have additional children and retain her uterus if at all possible. She signed a consent for the D&C and possible hysterectomy at 6:45 a.m., and was prepped for surgery and placed under general anesthesia.

At 8:18 a.m., Dr. Wolfe began the D&C procedure. He started by performing a bimanual exam to evaluate the size and consistency of Ms. Smith's uterus, and testified that he found it firm and not atonic.[2] Dr. Wolfe then used a curette to scrape the lining of the uterus, and then used suction to ensure nothing remained. He did not believe any placental tissue was extracted, and the bleeding continued. He next attempted to pack the uterus by tying two laparotomy pads

---

1 Hemodynamic stability refers to blood flow. The Plaintiff's standard-of-care expert witness, Dr. William Irvin, Jr., explained that several blood tests, including fibrinogen, hemoglobin, hematocrit, and platelet counts, as well as blood pressure, respiration, and heart rate, provide an objective warning sign of excessive blood loss.
2 "Atony" refers to a lack of muscle tone and inability of the muscle to contract.

3

together and inserting them into the uterus, then layering them until the uterus was fully packed and applying pressure. The precise timing is not clear, but Dr. Wolfe also gave Ms. Smith two uterotonics[3] to encourage the uterus to contract while he performed other procedures.[4] However, her bleeding continued, and Dr. Wolfe decided to convert to a hysterectomy. Ms. Smith was re-prepped and re-positioned, the appropriate instruments were assembled, and Dr. Wolfe prepared for a hysterectomy.

Prior to the hysterectomy, which began at 9:04 a.m., additional lab results were obtained, which again showed normal ranges of hemoglobin, hematocrit, and platelets. Dr. Wolfe testified that he was very concerned about Ms. Smith's ongoing blood loss, and that he did not place much weight on the lab results because the tests lag behind the blood loss.

The hysterectomy began with an exploratory laparotomy (opening the abdomen). Dr. Wolfe again palpated Ms. Smith's uterus and found that it was firm. He performed the hysterectomy, which stopped Ms. Smith's bleeding. She had no complications following the surgery. Ms. Smith received two units of packed red blood cells and two units of plasma during the hysterectomy, and her hemoglobin counts that evening and for the next two days, until her discharge, were below normal, reflecting significant blood loss. Dr. Wolfe examined the uterus after removing it, and testified that he observed an abnormal placentation site that he believed was consistent with placenta accreta.[5] The uterus was then sent to now retired Dr. Richard Myerowitz, who was a pathologist at Raleigh General Hospital at the time. Dr. Myerowitz found that the

---

[3] Uterotonics are medications that induce contraction of the uterus, and are used both to induce labor and to reduce postpartum hemorrhage.
[4] The billing record does not include one of the uterotonics, though it is listed in the anesthesia records. The Court accepts Dr. Wolfe's testimony that he ordered both.
[5] Placenta accreta occurs when the placenta attaches directly to the wall of muscle of the uterus, and can cause bleeding if the placenta does not detach. It is among the more serious potential causes of post-partum hemorrhage.

uterus and other tissue he examined were consistent with a normal 7-day postpartum state. He found no evidence of placenta accreta, either on his initial examination or upon review of the slides prior to offering his testimony via deposition.

The Defendant's expert pediatric pathologist, Dr. Matthew Thompson, testified that Ms. Smith had placenta accreta based on his review of the slides taken from her uterus by Dr. Myerowitz after her hysterectomy. However, Dr. Thompson based his diagnosis on a textbook in which the author expressed disagreement with the majority view as to the correct definition of placenta accreta and set forth a more expansive diagnostic criterion. He admitted that the slides would not support a placenta accreta diagnosis under the majority definition. The Plaintiffs' rebuttal pathology expert, Dr. Michael Kaufman, agreed with Dr. Myerowitz that the uterus reflected a normal post-partum state with no placenta accreta. Dr. Kaufman offered the opinion that Ms. Smith's bleeding was caused by infection, based on both clinical data (e.g., elevated white blood cell count and mild fever) and the inflammation found on the slides of the uterus. Dr. Thompson disagreed, stating that inflammation is normal following childbirth.

The Court finds that the testimony suggesting that placenta accreta caused Ms. Smith's post-partum hemorrhage to be unconvincing. In particular, Dr. Myerowitz's findings and testimony as the treating pathologist, and not a compensated expert witness, were highly credible. As causation was unknown during Dr. Wolfe's treatment, and causation does not alter the standard of care, the Court makes no definitive finding as to the cause of Ms. Smith's bleeding, beyond finding that it is more likely than not that she did not have placenta accreta.

Dr. William Irvin, who currently both practices and teaches gynecology and gynecologic oncology, testified for the Plaintiffs regarding the proper standard of care for postpartum

5

hemorrhage. Dr. Irvin's current primary practice does not include obstetrics, though it has in the past, and he handles obstetrics cases during overseas trips to offer medical care and training in Guyana. He had no opinion with respect to the cause of Ms. Smith's bleeding, but testified that doctors do not typically know the cause of postpartum bleeding, and the appropriate course of treatment was the same regardless of cause. He testified that the standard of care requires physicians to attempt a progression of treatments, proceeding from the least invasive to the most invasive (with hysterectomy as the last resort), until the bleeding is controlled. Dr. Irvin relied on a 2006 Practice Bulletin published by the American Congress of Obstetricians and Gynecologists (ACOG), entitled *Clinical Management Guidelines for Post-Partum Hemorrhage* (hereinafter, ACOG Bulletin), which the United States' expert witnesses agreed was authoritative. Dr. Irvin testified that the standard of care requires the following treatment modalities, in order:

> 1. uterine massage, by reaching inside the patient and massaging the uterus to try to get the uterine muscle to contract;
>
> 2. multiple doses of multiple uterotonics, each of which stimulates contraction of the uterine muscle in slightly different ways, such that use of a combination of several can be more effective than just one or two types;
>
> 3. uterine packing with gauze, by soaking the gauze in thrombin to stimulate clot formation, then layering it back and forth;
>
> 4. uterine packing with balloon tamponade, which is more effective than gauze because the balloon can be inflated inside the uterus and provide uniform compression, without filling with blood. Balloon tamponade can be done with a variety of types of inflatable balloon,

including commonly available devices such as a Foley catheter or condom, as well as more specialized devices;

5. D&C, which removes any retained product of conception; and

6. exploratory laparotomy, accompanied by

    a. open uterine massage, which can be more effective than the uterine massage prior to a laparotomy because the physician has access to the entire uterus;

        i. additional doses of uterotonics can be injected directly into the uterus to further stimulate contraction at this stage

    b. bilateral O'Leary stitches, which suture closed the uterine arteries to reduce the blood flow into the uterus;

    c. bilateral hypogastric ligation, which has largely been replaced by uterine artery ligation;

    d. B-lynch sutures, which are stitches placed on a compressed uterus to hold the compression in place;

    e. hemostatic multiple square suturing, which similarly stitches together the walls of the uterus; and

    f. uterine artery embolization, which is done by interventional radiologists and is intended to block blood flow into the uterus. Uterine artery embolization was not available at Raleigh General Hospital and would have required Ms. Smith to be transferred to the Charleston Area Medical Center (CAMC).

Most of the treatment options take only minutes to perform, and Dr. Irvin testified that it takes approximately one hour to complete the full cycle of treatment modalities. He cited balloon

7

tamponade, hemostatic multiple square suturing, B-Lynch sutures, and uterine artery embolization as particularly effective in stopping bleeding, including bleeding caused by placenta accreta. Studies showed that each had success rates over 60% in patients with placenta accreta and even higher success rates for patients with bleeding caused by other conditions; uterine artery embolization had a success rate of about 90%, for both all patients with post-partum hemorrhage and for patients with placenta accreta.

The Defense expert, Dr. Larry Griffin, testified that there was no need to attempt each treatment modality in this case, based on Dr. Wolfe's finding that Ms. Smith's uterus was firm and not atonic. Dr. Griffin testified that, at the time Dr. Wolfe examined Ms. Smith and made treatment decisions, the evidence pointed toward placenta accreta as the cause of her bleeding, though a final diagnosis could not be made until after removal of the uterus. Because there was no atony, he concluded that uterine massage was unnecessary, further uterotonics were unnecessary, and uterine packing and/or balloon tamponade was unlikely to be successful. Though the standard of care may require some attempt at applying pressure, Dr. Griffin offered the opinion that no specific method was required, and that uterine packing with gauze and balloon tamponade serve the same purpose. He further testified that Dr. Wolfe's method of uterine packing was within the standard of care, though he admitted that it was not the method described in the ACOG Bulletin.

Uterine artery embolization would have required that Ms. Smith be transferred to CAMC. Dr. Wolfe testified that he would not have considered transfer a viable or prudent option because of Ms. Smith's ongoing severe bleeding. The medical records generated at the time describe the bleeding as severe, but do not state that the hysterectomy had to be performed immediately to

8

preserve Ms. Smith's life, that transfer was impossible because of the level of blood loss, or any other indication that Dr. Wolfe or another treatment provider considered the level of blood loss to be imminently dangerous. No blood transfusion was given until the hysterectomy was performed. Dr. Irvin testified that all objective measures indicated that Ms. Smith remained stable enough for the approximately fifteen-minute helicopter ride to CAMC, and that if any indicator suggested she had lost too much blood, the proper course would have been to give her a transfusion prior to transfer. Dr. Griffin explained that blood count may not stabilize for a day or two after blood loss, and so, in his opinion, Dr. Wolfe properly rejected transfer as an option based on the reported heavy bleeding and his own observations as to the level of blood loss.

The Plaintiffs' rebuttal expert, Dr. David Talan,[6] offered the opinion that Ms. Smith was hemodynamically stable and could have been transferred or undergone additional treatment. Dr. Talan, an emergency physician, explained that vital signs (e.g., blood pressure, heart rate), are the key objective factor to consider when evaluating the stability of a patient experiencing blood loss. Ms. Smith's vital signs remained normal as Dr. Wolfe made the decision to convert to a hysterectomy. All other measures, including blood counts, urine output, and electrolyte levels, were also normal and signaled that Ms. Smith's blood loss was not reaching dangerous levels. Though some blood count numbers can lag behind blood loss, Dr. Talan testified that the several hours between the start of Ms. Smith's bleeding and the decision to convert to a hysterectomy were

---

6 The Defendant objected to Dr. Talan's rebuttal testimony, arguing that it was not proper rebuttal because it did not counter new facts presented in the Defendant's case and was duplicative of Dr. Irvin's testimony. The Court finds that it was proper rebuttal. Dr. Irvin, to some extent, anticipated the defense that Ms. Smith's condition was too urgent to permit additional treatment or transfer. However, the Plaintiffs are entitled to rebut the core contention presented in defense. Further, while Dr. Irvin briefly addressed Ms. Smith's stability, Dr. Talan's specialized expertise in emergency medicine and detailed testimony, at the least, provided a significant expansion on the basic principles Dr. Irvin testified to. That said, while the Court finds Dr. Talan's testimony admissible and helpful, the outcome would be the same absent his testimony, given the other evidence presented and, importantly, the medical records.

9

sufficient that the normal blood count numbers provided reassuring information regarding the level of blood loss. Dr. Talan further testified that it would have been fairly routine to give blood transfusions in order to maintain stability for transfer, as is often necessary in cases with more serious trauma.

Dr. David Seidler, the associate medical director for critical care transport, testified that a physician capable of performing uterine artery embolization was available at CAMC on December 25, 2013, and that the weather would not have precluded either air or ground transport on that date. He further testified that multiple companies providing both air and ground transport between Beckley and Charleston, West Virginia, were available.

Ms. Smith testified that she has little memory of her treatment on December 25, 2013, and learned that she had had a hysterectomy when she spoke with her husband after the surgery. Mr. Smith, in turn, learned about the hysterectomy when Dr. Wolfe met with him afterwards and represented that there were no other options. Mr. Smith cared for Ms. Smith and their newborn daughter when Ms. Smith was released from the hospital. Ms. Smith testified that she and her husband had planned to have additional children, that she wanted her daughter to have siblings, and that she is very upset by her infertility. She has also suffered depression and moodiness since the hysterectomy, which she believes contributes to marital problems. She and Mr. Smith both testified that they argue far more often than they did prior to the hysterectomy, and Mr. Smith testified that they no longer have a sexual relationship. The hysterectomy has caused Ms. Smith to go into early menopause, for which she takes Premarin. The Premarin has been somewhat helpful with her mood swings and hot flashes, though her marital problems have not improved.

In addition to her non-economic damages, Ms. Smith incurred economic losses in the amount of $29,661.67 in medical bills related to her treatment for post-partum hemorrhage.

## LEGAL CONCLUSIONS

The FTCA provides that the United States is liable for the negligent acts of its employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). Though FTCA cases are tried in federal court, the underlying state substantive law applies. West Virginia medical malpractice cases are governed by the West Virginia Medical Processionals Liability Act (MPLA). Medical malpractice cases in West Virginia require a plaintiff to demonstrate that the defendant failed to meet the applicable standard of care, typically by presenting expert witness testimony. W. Va. Code § 55-7B-7; *Goundry v. Wetzel-Saffle*, 568 S.E.2d 5, 8 (W. Va. 2002). Plaintiffs must also demonstrate that the failure to comply with the standard of care proximately caused the alleged injuries. W. Va. Code § 55-7B-3(a)(2). The MPLA requires that plaintiffs who claim the deviation from the standard of care "deprived the patient of a chance of recovery or increased the risk of harm to the patient which was a substantial factor in bringing about the ultimate injury to the patient" must "prove, to a reasonable degree of medical probability, that following the accepted standard of care would have resulted in a greater than twenty-five percent chance" of an improved recovery. § 55-7B-3(b).

Ms. Smith claims that Dr. Wolfe did not meet the applicable standard of care for her post-partum hemorrhage because he did not attempt all available treatment options before performing a hysterectomy. She argues that this deviation from the standard of care resulted in her having a hysterectomy and the loss of her fertility. Ms. Smith relies on expert testimony to demonstrate

11

that the treatment modalities Dr. Wolfe did not attempt would have had a greater than twenty-five percent chance of stopping the bleeding, thus eliminating the need for a hysterectomy.

Like most medical malpractice cases, this case rests largely on expert testimony. The Court found the expert witnesses for both parties to be well qualified, with significant relevant education and experience, although they reached differing conclusions. In short, Dr. Irvin testified that, had Dr. Wolfe employed the treatments required by the standard of care and/or transferred Ms. Smith to a facility with the ability to perform uterine artery embolization and with more expertise on the other treatment modalities, she would have been likely to retain her uterus and fertility. He gave the opinion that Dr. Wolfe's treatment was reckless and fell egregiously below the standard of care. Dr. Wolfe and Dr. Griffin testified that Ms. Smith's blood loss was too severe to spend additional time on treatment or transfer, and that other treatments were unlikely to be effective in treating placenta accreta. The Court credits Dr. Irvin's very thorough, well researched analysis, particularly in light of the Court's finding that there is little evidence to support a diagnosis of placenta accreta.

First, Dr. Irvin's explanation of the standard of care was based on the ACOG Bulletin, which both parties agreed was reliable. His testimony connected the general standards, research, and statistical success rates with the facts of this case. It was also reflective of certain facts both parties agree upon. For instance, the experts were all in agreement that placenta accreta cannot be confirmed as a diagnosis until after a hysterectomy has been performed, but Dr. Griffin nonetheless found some treatment modalities to be unnecessary under the standard of care based on diagnostic factors. Given the agreement among the experts that the cause of post-partum hemorrhage is often unknown during treatment, the Court accepts the credibility of Dr. Irvin's

opinion that the standard of care requires use of all available treatment modalities, from the most conservative to the most invasive. Dr. Irvin also offered research regarding the high success rates of treatments, including balloon tamponade, suturing to close arteries that bring blood to the uterus, suturing to compress the uterus, and uterine artery embolization, that demonstrate the likelihood that Ms. Smith's hemorrhage could have been stopped without a hysterectomy. The success rates of those treatments also supports the finding that the standard of care requires that they be attempted.

Next, the Court finds Dr. Wolfe's explanation that he proceeded to hysterectomy because it was unsafe to spend additional time on other treatments or to attempt transfer due to Ms. Smith's blood loss unconvincing. The Court accepts the initial contention that the standard of care is sufficiently flexible to permit a doctor to perform an emergency hysterectomy when necessary to save the life of the patient. However, the medical records in this case do not reflect the level of urgency described after the fact. Ms. Smith arrived at the hospital around 5:00 a.m., and Dr. Wolfe began the hysterectomy after 9:00 a.m. He first examined Ms. Smith around 6:30 a.m. Had he arranged transport shortly after examining her, the uterine artery embolization could have been completed by the time Dr. Wolfe began the hysterectomy. Further, there is no indication that any treatment provider suggested a blood transfusion until the hysterectomy was being performed. That indicates that the treatment providers were not as concerned about the level of blood loss as is now suggested. A blood transfusion could also have alleviated any concern and allowed Ms. Smith to be stabilized for transport or additional treatment, if necessary. Ms. Smith's stable vital signs and lab work indicate that it was not necessary to give blood transfusions prior

to the hysterectomy or to perform the hysterectomy without attempting other treatments or transfer to prevent her from bleeding to death.

Finally, the Court finds that Dr. Wolfe's treatment fell egregiously below the standard of care. He performed a D&C, gave single doses of two uterotonics, made a haphazard attempt at uterine packing by tying laparotomy sponges together and inserting them into the uterus, a method unlikely to be successful, and proceeded to a hysterectomy. He did not attempt uterine massage, additional uterotonics (which promote contraction in different ways), balloon tamponade, open uterine massage, bilateral O'Leary stitches, bilateral hypogastric ligation, B-Lynch sutures, hemostatic multiple square suturing, or transfer for uterine artery embolization. Excepting transfer for uterine artery embolization, these procedures would not have taken more than a few minutes each. Some would have taken only seconds to perform. Based on the success rates cited by Dr. Irvin, the Court finds that Ms. Smith would have a significantly greater than twenty-five percent (25%) chance of retaining her uterus and her fertility had Dr. Wolfe complied with the applicable standard of care.[7] Instead, she underwent a hysterectomy at twenty-four years old, following the birth of her first—and now only—biological child.

Ms. Smith's damages include the medical expenses associated with her post-partum hemorrhage, the loss of her fertility, the early menopause and/or hormonal changes that occurred following her hysterectomy, and emotional damages related to the loss of fertility, hormonal changes, and marital problems. Mr. Smith's loss of consortium damages include his

---

7 In finding that the standard of care requires all available treatment modalities, and that the likelihood of stopping the bleeding without a hysterectomy was greater than twenty-five percent (25%), the Court does not mean to suggest that the failure to perform each treatment, individually, caused Ms. Smith's damages. For example, additional uterotonics may have had little effect, given the lack of evidence of uterine atony. However, several treatments have high success rates for all causes of post-partum hemorrhage, and the Court finds a high likelihood that performing each of the treatment options in turn, until one proved successful, would have resulted in stopping Ms. Smith's bleeding without a hysterectomy.

corresponding inability to have additional biological children with his wife, and the marital problems that occurred as a result of Ms. Smith's hysterectomy.

The MPLA imposes limits on damages under specified circumstances. Section 55-7B-9c(a) sets a $500,000 cap for total damages in cases involving emergency care rendered at a designated trauma center. Section 55-7B-9c(h) provides that the cap does not apply if the care is "in willful and wanton or reckless disregard of a risk of harm to the patient; or in clear violation of established written medical protocols for triage and emergency health care procedures…" The Plaintiffs concede that Raleigh General Hospital is a trauma center and that Ms. Smith suffered an emergency medical condition, but argue that the exception is applicable because "the actions of Dr. Wolfe in not attempting to use the multiple modalities of treatment that were recognized for the use in a patient such as Mrs. Smith constituted a reckless disregard of a risk of harm to Mrs. Smith." (Pl.'s Am. Proposed Findings, at 50.) Instead, the Plaintiffs argue that W.Va. Code § 55-7B-8 is applicable. Section 55-7B-8 limits noneconomic damages in medical malpractice cases to $250,000, or $500,000[8] in cases involving, as relevant herein, loss of use of bodily organ system.

The Court finds that Dr. Wolfe's failure to attempt alternative treatments prior to performing a hysterectomy, on a twenty-four-year-old patient with stable vital signs and no evidence of hemodynamic instability, constitutes a reckless disregard to a risk of harm to the patient. Therefore, there is no limitation on economic damages, and the limitation on non-economic damages is $643,020. Ms. Smith's economic loss totaled $29,661.67.

---

8 Section 55-7B-8(c) provides that the limitations on compensatory damages in that section shall be subject to increases for inflation, from 2003, based on the Consumer Price Index published by the Department of Labor. The current cap is $643,020.

15

Non-economic damages are more difficult to quantify. *See, e.g.*, *In re Air Crash Disaster at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1115, 1127-30 (D.S.C. 1997) (stating that "[q]uantifying the pain and suffering experienced by a personal injury plaintiff is difficult in the best of circumstances" and noting that emotional damages are unique to each plaintiff and require a subjective analysis). The Court has reviewed the damages awarded by juries in other medical malpractice cases involving potentially unnecessary hysterectomy and accompanying loss of fertility. *See, e.g.*, *Brown v. State ex rel. LSU Med. Ctr. Health Care Servs. Div.*, 2008-273 (La. App. 3 Cir. 12/10/08), 998 So. 2d 367, 373, *writ denied sub nom. Brown v. State*, 2009-0072 (La. 3/6/09), 3 So. 3d 491 (jury included $725,000 in non-economic damages; total damage award of over $2,000,000 reduced to state damages cap); PAULING v. GEORGE WASHINGTON UNIVERSITY, JVR No. 434579, 2003 WL 25032008 ($900,000 pain and suffering award to 38-year-old woman who underwent a hysterectomy after physician negligently performed surgery to remove uterine fibroids, causing infection)[9]; WEISE v. MEDSTAR HEALTH CARE SERVICES; GEORGETOWN UNIVERSITY MEDICAL CENTER, JVR No. 434507, 2005 WL 4255167 (pain and suffering award of over $11 million to 28-year-old woman who suffered hysterectomy, pelvic nerve damage, bladder and ureter damage, kidney infection, chronic pain, and PTSD following negligently-performed C-section); DABROWSKI v. PORTNER, M.D., JVR No. 187732, 1996 WL 696013 ($200,000 awarded to 35-year-old woman who underwent a hysterectomy after a doctor failed to properly diagnose and treat peritonitis); HALL v. ALEXANDER, M.D.; INTEGRATED OB/GYN, JVR No. 1306010009, 2013 WL 2468371 ($1,070,636 awarded to 21-year-old woman who underwent a hysterectomy and suffered the

---

9 This and the following cases are the result of a search for "hysterectomy" within the "Jury Verdict and Settlements" database in Westlaw, limited to the Fourth Circuit.

16

metastasis of uterine cancer to her lungs after a doctor failed to diagnose a gestational trophoblastic malignancy); REDFORD v. U.S.A., JVR No. 107624, 1992 WL 507570 ($170,000 awarded to 27-year old FTCA plaintiff who alleged a hysterectomy was performed without exhausting conservative treatment options).

Though non-economic damages require subjective analysis of each unique plaintiff, it is clear that juries generally consider hysterectomy and loss of fertility to be quite serious. Here, the Court has carefully considered Ms. Smith's testimony, as well as the testimony of her husband. The couple planned to have additional children. The inability to have children is itself a loss, and it also contributes to the emotional harm Ms. Smith continues to suffer. Hormonal changes have also impacted her personality and mood, which has in turn damaged her marriage. Ms. Smith's age is an additional factor that increases her damages, given the increased number of years she would otherwise have had before reaching menopause. Mr. Smith is also impacted by the couple's inability to have additional biological children and the deterioration of their marriage. Having carefully considered the damages suffered by the Plaintiffs, and in light of both the Court's experience with jury verdicts in state and federal medical malpractice cases and a review of similar cases, the Court finds that Ms. Smith has suffered damages in excess of the statutory cap. The Court therefore awards her $643,020.00 in compensatory damages for non-economic losses, in addition to the $29,661.67 for medical bills. Although Mr. Smith is impacted by Ms. Smith's hysterectomy and emotional suffering, his testimony did not indicate significant emotional suffering of his own. Of the $643,020.00 in non-economic damages, the Court finds that Mr. Smith is entitled to $40,000 for loss of consortium, an amount in line with both the Court's experience and review of similar cases.

**CONCLUSION**

WHEREFORE, after thorough review and careful consideration, the Court finds that Dr. Roy Wolfe breached the applicable standard of care in treating Sarah Lambert Smith for post-partum hemorrhage on December 25, 2013. The Court **ORDERS** that judgment be entered in favor of the Plaintiffs and against the United States, in the amount of $29,661.67 for Ms. Smith's economic damages, $603,020.00 in non-economic damages for Ms. Smith, and $40,000 in loss of consortium damages for Mr. Smith, for a total of **$672,681.67**.

The Court further **ORDERS** that all pending motions in this matter be **TERMINATED AS MOOT**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: November 15, 2016

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA